UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                            :

THE INTERFAITH ALLIANCE, *et al.,*         :

                  Plaintiffs,      :

         -v-             :           26 Civ. 1075 (JPC)

                            :

DONALD TRUMP, *et al.*,           :          OPINION AND ORDER

                            :

                Defendants.     :

                            :
-----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

More than fifty years ago, Congress enacted the Federal Advisory Committee Act ("FACA") in response to growing reliance on formal and informal advisory committees. At its core, the Act reflects a compromise: Congress was concerned about advisory committees being dominated by special interests, but also realized that such committees could be useful sources of advice and ideas. So instead of saddling advisory committees with endless red tape, Congress imposed relatively light requirements, two of which are relevant here. First, a committee's membership must be "fairly balanced" in light of the functions it performs. And second, materials relied upon by a committee must be made available for public inspection and review.

This case presents a FACA challenge to the Religious Liberty Commission (the "RLC" or the "Commission"), an advisory committee established last year by President Donald J. Trump. The RLC consists of up to fourteen voting members appointed by the President and is tasked with producing a report on the foundations of religious liberty in America and the current threats to its exercise. Plaintiffs argue that the Presidentially-appointed members of the RLC are not fairly balanced and that the RLC has not disclosed various materials that it has relied upon. Furthermore, because the RLC is expected to publish its final report soon—possibly in the coming weeks—

Plaintiffs request a preliminary injunction preventing the RLC from issuing its report and ordering it to disclose its records and documents. Defendants oppose injunctive relief and move to dismiss Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

As explained more fully below, the Court grants Defendants' motion to dismiss, as each of Plaintiffs' claims fails for either a lack of standing or a failure to state a claim. And because the Court dismisses those claims without leave to amend, Plaintiffs' motion for a preliminary injunction is denied as moot.

## I.  Background[1]

### A.    The Religious Liberty Commission

On May 1, 2025, President Trump created the RLC by issuing Executive Order 14291 (the "EO"). 90 Fed. Reg. 19,417 (May 7, 2025). The EO begins with a section on "Purpose and Policy," which declares that it is "the policy of the executive branch to vigorously enforce . . . protections for religious liberty" so that "religious people and institutions are free to practice their faith without fear of discrimination or hostility from the Government." *Id.* at 19,417. Yet, the EO states that "[i]n recent years, some Federal, State, and local policies have threatened America's unique and beautiful tradition of religious liberty." *Id.* The "opponents of religious liberty" behind these measures seek to "remove religion entirely from public life" or "characterize religious liberty as inconsistent with civil rights." *Id.* In order to counteract these "emerging threats," the EO promises that "the Federal Government will promote citizens' pride in our foundational history, identify emerging threats to religious liberty, uphold Federal laws that protect all citizens' full participation in a pluralistic democracy, and protect the free exercise of religion." *Id.*

---

[1] The facts discussed herein are drawn mainly from the allegations in Plaintiffs' Complaint, Dkt. 4 ("Compl."), and are accepted as true for purposes of resolving Defendants' motion to dismiss. *See Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 141 (2d Cir. 2011).

After this introductory section, the EO describes the functions of the RLC. *Id.* at 19,417-19,418. First, the RLC "shall produce a comprehensive report on the foundations of religious liberty in America, the impact of religious liberty on American society, current threats to domestic religious liberty, strategies to preserve and enhance religious liberty protections for future generations, and programs to increase awareness of and celebrate America's peaceful religious pluralism." *Id.* at 19,418. Such report must address, among other topics, the First Amendment rights of religious practitioners, "conscience protections in the health care field and concerning vaccine mandates," "parents' authority to direct the care, upbringing, and education of their children," and "permitting time for voluntary prayer and religious instruction at public schools." *Id.* Second, the RLC "advise[s] the White House Faith Office and the Domestic Policy Council on religious liberty policies of the United States." *Id.* This role includes, among other responsibilities, "recommending steps to secure domestic religious liberty by executive or legislative actions." *Id.*

The EO also details logistics for the establishment and operation of the Commission. As relevant here, the RLC "shall be composed of up to 14 members appointed by the President" who will "serve as educated representatives of various sectors of society, including the private sector, employers, educational institutions, religious communities, and States." *Id.* at 19,417. These President-selected members may then designate, as *ex officio* members, the Attorney General of the United States, the Secretary of the United States Department of Housing and Urban Development ("HUD"), and the Assistant to the President for Domestic Policy. *Id.* at 19,418.[2] Additionally, the Department of Justice ("DOJ") "shall provide such funding and administrative and technical

---

[2] Although not challenged in this case, the EO also provides for the creation of an "Advisory Board of Religious Leaders," an "Advisory Board of Lay Leaders," and an "Advisory Board of Legal Experts" to "advise members of the [RLC]." 90 Fed. Reg. at 19418; *see* The White House, *President Donald Trump Names Advisory Board Members to the Religious Liberty Commission* (May 16, 2025), https://perma.cc/L49J-X5D4 (captured July 22, 2026) (announcing the members of each of these advisory boards).

support as the Commission may require." *Id.* at 19,419. And finally, the EO provides that "any functions of the President under [FACA], except for those in sections 1005 and 1013 of that Act, shall be performed by the Attorney General, in accordance with the guidelines and procedures established by the Administrator of General Services." *Id.*[3]

On the same day that President Trump issued the EO, he also announced his selection of thirteen RLC members. *See* The White House, *President Trump Announces Religious Liberty Commission Members* (May 1, 2025), https://perma.cc/BA75-BC97 (captured July 22, 2026).[4] President Trump selected Dan Patrick, the Lieutenant Governor of Texas, as the RLC's Chairman, and Dr. Ben Carson, a former HUD Secretary, as its Vice Chairman. *Id.* The other eleven members were Bishop Robert Barron, Cardinal Timothy Dolan, Pastor Franklin Graham, Pastor Paula White, Rabbi Meir Soloveichik, Dr. Ryan T. Anderson, Carrie Prejean Boller, Dr. Phil McGraw, Eric Metaxas, Kelly Shackelford, and Allyson Ho. *Id.* These thirteen RLC members then designated Pamela Bondi, the former Attorney General of the United States; Scott Turner, the Secretary of HUD; and Vince Haley, the Director of the Domestic Policy Council, as *ex officio* members. Compl. ¶ 51. Each of these members continues to serve on the RLC except for Carrie Prejean Boller, who has not been part of the Commission since at least March 23, 2026. *Compare* The White House, *President Trump Announces Religious Liberty Commission Members*, https://perma.cc/BA75-BC97 (captured July 22, 2026) (announcing Carrie Prejean Boller as an RLC member), *with* U.S. Department of Justice, Religious Liberty Commission ("RLC Website"),

---

[3] FACA authorizes the Administrator of the General Services Administration ("GSA") to "prescribe administrative guidelines and management controls applicable to advisory committees." 5 U.S.C. § 1006(c). For reasons explained below, such regulations are not pertinent here. *See infra* n.20, n.37.

[4] President Trump did not select a fourteenth RLC member. *See* Dkt. 65 ("Oral Arg. Tr.") at 30:4-5 ("There has been a vacancy on the commission for several months, and no one has filled that.").

*Commissioners and Advisory Board Members*, https://perma.cc/2RA8-DMS4 (captured July 22, 2026) (indicating that Carrie Prejean Boller was not a member of the RLC as of the website's last update on March 23, 2026), *and* Dkt. 40 ("Pls. Motion") at 14 n.21 (stating that Carrie Prejean Boller "was removed from the Commission").

Thus far, the RLC has held hearings on June 16, 2025, September 8, 2025, September 29, 2025, December 10, 2025, February 9, 2026, March 16, 2026, and April 13, 2026.  Dkt. 53 ("Bush Decl.") ¶¶ 6-12.  The Commission plans to hold a final meeting at some point in the near future. *Compare* Dkt. 52 ("Defts. Motion") at 5 (stating on April 28, 2026, that there would be "a public meeting . . . held in or about May 2026"), *with* Oral Arg. Tr. at 4:7-13 (stating on June 4, 2026, that "the timeline has been pushed back just a little bit. . . .  The final meeting has not yet occurred"). The RLC's website states that "[a]ttendance information will be posted [online] and in the Federal Register at least seven (7) days prior to the meeting."  RLC Website, *Upcoming Events*, https://perma.cc/KF8B-HJVT (captured July 22, 2026).

On June 26, 2026, the RLC published a draft of its report on religious liberty and opened a fifteen-day period for public comment, which closed on July 12 or July 13, 2026.  *Compare* Dkt. 64 at 1 (letter, dated June 30, 2026, from Plaintiffs providing notice of these factual developments and stating that the comment period would close on July 12, 2026), *with* RLC Website, *Upcoming Events*, https://perma.cc/KF8B-HJVT (captured July 22, 2026) (stating that the comment period would close on July 13, 2026).  At the Commission's final meeting, it will "review [public] comments . . . , discuss the draft, and finalize the report."  RLC Website, *Upcoming Events*, https://perma.cc/KF8B-HJVT (captured July 22, 2026); *accord* Dkt. 64 at 1 (citation modified).

**B.     The Federal Advisory Committee Act**

The parties agree that the RLC is subject to FACA, which enacted "a series of requirements governing the creation and operation of [advisory committees]," *Cummock v. Gore*, 180 F.3d 282,

285 (D.C. Cir. 1999), in response to "the great growth of advisory committees [that] occurred after World War II," Steven P. Croley & William F. Funk, *The Federal Advisory Committee Act and Good Government*, 14 YALE J. ON REG. 451, 458-59 (1997).  In large part, FACA's provisions reflect "a dichotomous attitude toward advisory groups."  Richard O. Levine, Comment, *The Federal Advisory Committee Act,* 10 HARV. J. ON LEGIS. 217, 225 (1973).  On one hand, "Congress recognized that advisory committees 'are frequently a useful and beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal Government.'"  *Cummock*, 180 F.3d at 284 (quoting 5 U.S.C. app. 2 § 2(a), now codified at 5 U.S.C. § 1002(a)).  But on the other hand, "Congress also feared the proliferation of costly committees, which were often dominated by representatives of industry and other special interests seeking to advance their own agendas."  *Id.*  FACA's "dualism" is thus a result of the fact that the Act was a careful compromise between "proponents and opponents of the advisory committee process."  Levine, *supra*, at 225; *see also Pub. Citizen v. DOJ*, 491 U.S. 440, 455-56 (1989) ("FACA did not flare on the legislative scene with the suddenness of a meteor.  Similar attempts to regulate the Federal Government's use of advisory committees were common during the 20 years preceding FACA's enactment.").

Three FACA requirements are particularly relevant here.  First, "the President, agency heads, or other Federal officials[,] in creating an advisory committee[,]" must "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. § 1004(b)(2), (c).  "Read literally, th[is] provision [appears to] require[] a 'fair balance' both of viewpoints and of functions," but in practice, the provision has been "applied as if it read 'a fair balance of viewpoints given the functions to be performed.'"  Levine, *supra*, at 225; *see, e.g., Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control*, 711 F.2d 1071, 1074 (D.C. Cir. 1983) (assessing whether a "[c]ommittee's members represent a fair balance of

viewpoints given the functions to be performed").

Second, FACA provides that, "[s]ubject to [the Freedom of Information Act ('FOIA')], the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist." 5 U.S.C. § 1009(b).[5] This provision notably "contains no deadline by which advisory committee materials must be made available." *Lawyers' Comm. for C.R. Under L. v. Presidential Advisory Comm'n on Election Integrity* ("*LCCRUL*"), 265 F. Supp. 3d 54, 69 (D.D.C. 2017) (internal quotation marks omitted).

Finally, FACA requires that "[t]here shall be designated an officer or employee of the Federal Government to chair or attend each meeting of each advisory committee." 5 U.S.C. § 1009(e). This designated federal officer ("DFO") is not herself a member of the committee—for purposes of the RLC, her responsibilities merely entail "convening and attending all RLC meetings, maintaining information and records on the RLC's activities and providing such information to the public, as applicable, and generally ensuring compliance with applicable laws and regulations." Bush Decl. ¶ 1; *see Pub. Citizen*, 491 U.S. at 446 (explaining that under FACA, advisory committee "meetings must be chaired or attended by an officer or employee of the Federal Government who is authorized to adjourn any meeting when he or she deems its adjournment in the public interest"). The RLC's DFO is Mary Margaret Bush, an employee of the DOJ. Bush Decl. ¶ 1.

---

[5] Section 1009(b)'s "reference to FOIA is . . . meant to incorporate the nine exemptions from disclosure found in 5 U.S.C. § 552(b)." *Food Chem. News v. Dep't of Health & Hum. Servs.*, 980 F.2d 1468, 1469 (D.C. Cir. 1992); *accord NRDC v. Zinke*, No. 18 Civ. 6903 (AJN), 2020 WL 5766323, at *5 (S.D.N.Y. Sept. 28, 2020) ("Agencies are required to make [Section 1009(b)] materials available to the public as a matter of course, unless a FOIA exception applies."). These exemptions are not relevant to the resolution of this case.

Although FACA subjects advisory committees to these and other requirements, it "does not create a private cause of action" for violations of its provisions. *NRDC v. Dep't of Interior*, 410 F. Supp. 3d 582, 590 (S.D.N.Y. 2019). "Accordingly, plaintiffs alleging FACA violations must bring their claims under another right of action." *Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170, 177 (D.D.C. 2022). "Most commonly, plaintiffs will assert a cause of action under the [Administrative Procedure Act ('APA')], which, in relevant part, empowers courts to 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). "[T]he APA applies only to federal agencies," however, so plaintiffs can seek only mandamus relief against non-agency defendants. *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 532 (2d Cir. 2010); *accord NAACP Legal Def. & Educ. Fund v. Barr*, 496 F. Supp. 3d 116, 145 (D.D.C. 2020) ("Mandamus is the only vehicle for [the plaintiff's] claims against [parties that are] not an agency subject to the APA."). Mandamus relief more broadly permits a district court "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361; *see also Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (explaining that the federal mandamus statute "codified . . . [t]he common-law writ of mandamus").

## C.    Plaintiffs' Claims

Interfaith Alliance, Muslims for Progressive Values, the Sikh American Legal Defense and Education Fund, Hindus for Human Rights, and Reverend Paul Raushenbush (collectively, "Plaintiffs") initiated this action on February 9, 2026. Dkt. 1.[6] Interfaith Alliance, Muslims for Progressive Values, the Sikh American Legal Defense and Education Fund, and Hindus for Human

---

[6] Plaintiffs' Complaint was initially rejected by the Clerk's Office due to a filing error, so Plaintiffs re-filed their Complaint on February 10, 2026. *See* Dkt. 4.

Rights (collectively, the "Organizational Plaintiffs") are organizations which engage in government advocacy and public education on religious issues. Compl. ¶¶ 14, 16-18. Muslims for Progressive Values, the Sikh American Legal Defense and Education Fund, and Hindus for Human Rights represent the interests of Muslim, Sikh, and Hindu communities, respectively, while Interfaith Alliance advocates for "religious freedom, social justice, and fostering a diverse and inclusive society." *Id.* Reverend Raushenbush is the President and Chief Executive Officer of Interfaith Alliance. *Id.* ¶ 15.

Plaintiffs' Complaint alleges that the RLC violated FACA's requirement that its membership be "fairly balanced," 5 U.S.C. § 1004(b)(2), and disregarded its duty under FACA to "make available" various materials, *id.* § 1009(b). As to the former issue, Plaintiffs allege that the RLC is imbalanced in three ways. First, the RLC "contains no members who represent the perspective of a non 'Judeo-Christian' religious tradition." Compl. ¶ 59. Indeed, all of the RLC's members identify as Christian except for Rabbi Meir Soloveichik, who is an Orthodox Jewish Rabbi. *Id.* ¶ 51. Plaintiffs say that this composition reflects President Trump's adoption of a "Judeo-Christian framework," wherein he aims to "protect the Judeo-Christian principles of our founding." *Id.* ¶¶ 52-53 (internal quotation marks omitted). Second, Plaintiffs contend that the RLC is unfairly balanced because "each member of the Commission has expressed the view that the law should protect the exercise of religious beliefs over the civil rights of minority groups." *Id.* ¶ 55. According to Plaintiffs, the RLC "excludes perspectives that emphasize the full diversity of American religious life, including those faith traditions that value equal dignity for all." *Id.* ¶ 60. Finally, Plaintiffs allege that the RLC is "imbalanced in its representation of views on . . . the separation of church and state." *Id.* ¶ 54. In Plaintiffs' view, "many members [of the RLC] have . . . argu[ed] that religion, specifically what they would term 'Judeo-Christian' values, should be promoted by the government." *Id.* ¶ 56.

9

Plaintiffs also allege several violations of FACA's disclosure requirements.  According to Plaintiffs, the RLC "did not provide advance notice of witness lists or other documents made available to the Commission in advance of [its] meetings," *id.* ¶ 76, circulate "agendas for the meetings in advance," *id.* ¶ 77, or produce "complete transcripts for [its] September 8, September 29, or December 10, 2025 meetings," *id.* ¶ 78.  Additionally, as alleged in the Complaint, "[n]one of the witness statements made to the Commission have been made publicly available in written form," *id.* ¶ 79, "[d]etailed meeting minutes for the meetings have not been made publicly available," *id.* ¶ 80, and "at least one" video recording of an RLC meeting "appear[s]" to be edited or incomplete, *id.* ¶ 78.

Plaintiffs allege that they are impacted by these violations of FACA in various ways.  First, on December 15, 2025, Reverend Raushenbush "requested to be appointed to the Commission," but his "request was constructively denied when he failed to receive a response" to his application. *Id.* ¶ 84.  Reverend Raushenbush now contends that, as a result of the RLC's unfair balance, he was deprived of "a fair adjudication of [his] application for membership."  Dkt. 56 ("Pls. Opposition") at 5.  Second, all Plaintiffs argue that they lack a "representative voice" on the RLC due to its improper balance.  Compl. ¶ 110.  As a result, Plaintiffs fear "that the Commission's final report will harm [their] organizational interests," and that they "will need to divert further resources to advocate for pluralistic democracy and fight back against extremists who would privilege those who hold a narrow set of Judeo-Christian beliefs."  *Id.* ¶ 97.[7]  Finally, the Organizational Plaintiffs argue that if the RLC "operated transparently and in compliance with FACA['s disclosure requirements], [they] would be better able to monitor its activities, attend its meetings, participate

---

[7] Although the Complaint describes this prospective impact using the future tense, Reverend Raushenbush later submitted a declaration stating that Interfaith Alliance has already "had to divert resources and staff."  Dkt. 41 ("Raushenbush Decl.") ¶ 11.

in those meetings to advance its interests to the extent possible, and educate its stakeholders on the Commission's work." *Id.* ¶ 95 (Sikh American Legal Defense and Education Fund); *accord id.* ¶¶ 88 (Interfaith Alliance), 90 (Muslims for Progressive Values), 98 (Hindus for Human Rights).

Plaintiffs' Complaint names as Defendants Donald Trump, in his official capacity as President of the United States; Pamela Bondi, in her official capacity—at the time of the lawsuit— as the Attorney General of the United States;[8] the DOJ; the RLC itself; and Bush, in her official capacity as the RLC's DFO. Counts One and Two of the Complaint allege a violation of FACA's fairly balanced requirement, and seek relief, respectively, (1) under the APA against former Attorney General Bondi and the DOJ, *id.* ¶¶ 100-113, and (2) under the federal mandamus statute against President Trump, the RLC, and Bush, *id.* ¶¶ 114-124. Counts Three and Four of the Complaint allege violations of FACA's disclosure requirements, and—as with Counts One and Two—seek relief, respectively, (1) under the APA against former Attorney General Bondi and the DOJ, *id.* ¶¶ 125-130, and (2) under the federal mandamus statute against President Trump, the RLC, and Bush, *id.* ¶¶ 131-135. To remedy their injuries, Plaintiffs request that the Court (1) issue a declaratory judgment that the RLC's membership is imbalanced and its disclosures are deficient, (2) "[o]rder Defendants to employ good faith efforts to appoint a properly qualified representative from the excluded viewpoints," (3) "[e]njoin Defendants to attach to any reports or recommendations produced by the Commission a disclaimer stating that the report was produced in violation of FACA's [fairly balanced] requirement," (4) "[o]rder Defendants to immediately release all materials prepared for the Commission," and (5) grant any other relief as is necessary,

---

[8] Bondi has been replaced as United States Attorney General by Acting Attorney General Todd Blanche. *See* U.S. Department of Justice, *Office of the Attorney General*, *Acting Attorney General Todd Blanche*, https://perma.cc/W92K-MPVX (captured July 22, 2026). In accordance with Federal Rule of Civil Procedure 25(d), the Clerk of the Court is respectfully directed to substitute Todd Blanche, in his official capacity as Acting Attorney General of the United States, for Pamela Bondi as a Defendant in the caption of this case.

just, or proper.  *Id.* at 40-41.

**D.    Procedural History**

On April 2, 2026—less than two months after initiating this action and before Defendants had responded to the Complaint—Plaintiffs moved for a preliminary injunction.  Dkts. 39 ("Notice of Motion"), 40.  Plaintiffs sought such immediate relief because, although the RLC was slated to continue operating until September 30, 2027, its Chairman, Lieutenant Governor Dan Patrick, announced at the RLC's March 16, 2026 meeting "that the Commission would 'present our report to the President in May, almost one year from the day that he issued the executive order [creating the RLC].'"  Pl. Motion at 9 (quoting The Justice Department, *Religious Liberty Commission, Sixth Hearing*, at 4:04:40 (YouTube, Mar. 16, 2026), https://www.youtube.com/watch?v= MP2fFuYT3bM, (last visited July 27, 2026)).  Plaintiffs argue that once the RLC's final report is presented to the President, "the injury to Plaintiffs stemming from the Commission's violations of FACA will be irreversible" because after it "is read by both the public and policymakers, it cannot be unread."  *Id.* at 19.  Plaintiffs therefore ask the Court to "enjoin[] the Defendants from publishing the Religious Liberty Commission's report and order[] the Religious Liberty Commission to make public [its] records and documents."  Notice of Motion.  In support of their motion, Plaintiffs submitted declarations from Reverend Raushenbush, Dkt. 41; Ani Zonneveld, the Founder and President of Muslims for Progressive Values, Dkt. 42 ("Zonneveld Decl."); Ria Chakrabarty, the Senior Policy Director of Hindus for Human Rights, Dkt. 43 ("Chakrabarty Decl."); and Kiran Kaur Gill, the Executive Director of the Sikh American Legal Defense and Education Fund, Dkt. 44 ("Gill Decl.").

On April 28, 2026, Defendants opposed Plaintiffs' motion for a preliminary injunction and moved to dismiss the Complaint, arguing, *inter alia*, that Plaintiffs lack standing and fail to state a claim for relief.  Dkts. 51-52.  In support of their motion, Defendants submitted a declaration from

Bush, the RLC's DFO.  Dkt. 53.  Bush's April 28 declaration represented that "[a]s of [that date], all (i) notices of RLC meetings; (ii) videos and transcripts of RLC meetings; (iii) minutes of RLC meetings; (iv) written comments submitted by the public prior to RLC hearings and provided to the Commissioners; and (v) materials or packets submitted by the public prior to RLC hearings and provided to the Commissioners have all been published."  Bush Decl. ¶ 13; *see also* Pls. Opposition at 26 (noting that Defendants made a "publication of documents on the day their opposition brief was due").

On May 11, 2026, Plaintiffs submitted a brief in opposition to Defendants' motion to dismiss and in further support of their motion for a preliminary injunction.  Dkt. 56.  Plaintiffs acknowledge that "Defendants' document publications [on April 28, 2026] encompass[ed] many of the documents [that they had] sought in this case," but do "not concede that Defendants [had] completed a full production of all materials required to be disclosed under FACA."  Pls. Opposition at 26, n.12.  On May 22, 2026, Defendants filed a supplemental declaration from Bush stating that, "in response to queries from [P]laintiffs, [Bush] identified approximately 60 pages of additional [RLC] records that have since been published."  Dkt. 63 ("Bush Suppl. Decl.") ¶ 4.  That same day, Defendants also filed a reply brief in further support of their motion to dismiss.  Dkt. 62 ("Defts. Reply").  Then, on June 4, 2026, the Court held oral argument on Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss.  *See* Minute Entry for June 4, 2026; Oral Arg. Tr.  After oral argument, on June 30, 2026, Plaintiffs submitted a letter informing the Court that, four days earlier, the RLC had published a draft of its anticipated report on the state of religious liberty in America.  Dkt. 64.

## II.  Discussion

The Court grants Defendants' motion to dismiss Plaintiffs' Complaint and, as a result, denies as moot Plaintiffs' motion for a preliminary injunction.  This Section describes the relevant

legal standards for the Court's analysis, before explaining why Plaintiffs' fairly balanced claims

and disclosure claims each fail—in part for lack of standing and in part for failure to state a claim.[9]

## A.    Legal Standards

Defendants argue that Plaintiffs' Complaint should be dismissed on two bases.   First,

Defendants argue that the Complaint should be dismissed for lack of standing pursuant to Federal

Rule of Civil Procedure 12(b)(1).   Defts. Motion at 9-23.   Standing is an "essential and unchanging

---

[9] Plaintiffs and Defendants agree that if Reverend Raushenbush's claims are dismissed, then the other Plaintiffs' claims should either be dismissed for improper venue or transferred to the District of Columbia, because no other party has a connection to this District. *See* Defts. Motion at 35 n.16 ("[I]f Raushenbush is dismissed from the lawsuit, the Complaint should be dismissed for improper venue."); Pls. Opposition at 7 n.8 ("Should this Court conclude that Plaintiff Raushenbush lacks standing, . . . Plaintiffs respectfully request that this Court transfer this case to the District Court for the District of Columbia pursuant to 28 U.S.C. § 1406."); *see also* 28 U.S.C. § 1391(e) (describing venue requirements for a "civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority").   But notwithstanding the parties' agreement, the notion that venue can become improper because a party has been dismissed is in tension with the rule that "[v]enue is determined based upon the parties and allegations at the time the operative complaint is filed, not subsequent events." *Keitt v. New York City*, 882 F. Supp. 2d 412, 459 n.44 (S.D.N.Y. 2011).   At the very least, there appears to be unclarity as to whether a court may conclude that venue is improper after dismissing the claims of one of the parties. *Compare N-N v. Mayorkas*, 540 F. Supp. 3d 240, 252-53 (E.D.N.Y. 2021) (rejecting the argument "that the Eastern District of New York is no longer a proper venue . . . because the claims of [one] plaintiff . . . are moot, and the action has no other meaningful connection to this forum," because "[v]enue was proper at the time this case was filed"), *and Holmes v. Energy Catering Servs., LLC*, 270 F. Supp. 2d 882, 885 n.1 (S.D. Tex. 2003) ("Under section 1391, venue is determined when the suit is filed and is not affected by subsequent events such as the dismissal of a defendant, as occurred here."), *with Miller v. Albright*, 523 U.S. 420, 427 (1998) (noting that "the District Court concluded that [one plaintiff] did not have standing and dismissed him as a party[, and b]ecause venue in Texas was therefore improper, the court transferred the case to the District Court for the District of Columbia" (internal citations omitted)).

"Since venue is not a jurisdictional issue, however, [the Court] need not address it before turning to the merits," and may "assume, without deciding, that venue [is proper] and turn to the substance of plaintiffs' claims." *Hanly v. Powell Goldstein, LLP*, 290 F. App'x 435, 438 n.2 (2d Cir. 2008) (internal citations omitted); *accord Moreno-Bravo v. Gonzales*, 463 F.3d 253, 258 (2d Cir. 2006) ("[V]enue in the federal courts is a concept of convenience, not a jurisdictional mandate." (internal quotation marks omitted)); *Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs*, 307 F.2d 21, 29 (2d Cir. 1962) ("Venue in the federal courts is not a jurisdictional concept.").   The Court adopts this approach here, resting its decision on issues other than venue.

part" of Article III of the U.S. Constitution, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), which "confines the federal judicial power to the resolution of 'Cases' and 'Controversies,'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2, cl. 1).  It requires that a plaintiff "have a personal stake in [a] dispute" before he is able "to get in the federal courthouse door and obtain a judicial determination of what the governing law is." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (internal quotation marks omitted).  In other words, even if a plaintiff can show a legal violation, he must also answer: "What's it to you?"  Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 882 (1983).[10]

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423.[11]  Under this test, a concrete injury must be "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (internal quotation marks omitted).  "The most obvious [kinds of concrete injury] are traditional tangible harms," but "[v]arious intangible harms can also be concrete." *TransUnion*, 594 U.S. at 425.  Particularization, meanwhile, is "quite different" from concreteness—it asks not whether an injury "actually exists," but rather whether such injury "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339-40 (internal quotation marks omitted).  Despite this difference in focus, however, concreteness and particularization ultimately get at the same question: "Is the injury too abstract, or otherwise not

---

[10] "[S]tanding is not dispensed in gross," so "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 594 U.S. at 431.

[11] "The party invoking federal jurisdiction bears the burden of establishing [standing]," but as discussed below, "the manner and degree of evidence required" to meet that burden varies with "the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

appropriate, to be considered judicially cognizable?"  *Allen v. Wright*, 468 U.S. 737, 752 (1984); *see also Flast v. Cohen*, 392 U.S. 83, 97 (1968) ("Federal judicial power is limited to those disputes . . . which are traditionally thought to be capable of resolution through the judicial process.").

A corollary of the standing requirement is the rule "that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  *Steffel v. Thompson*, 415 U.S. 452, 460 n.10 (1974).  "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot."  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (internal quotation marks omitted).  That said, "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted).  Thus, "as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435, 442 (1984).

A defendant who seeks to dismiss a complaint for lack of standing may choose to make a facial or a factual motion.  "When the Rule 12(b)(1) motion is facial, *i.e.,* based solely on the allegations of the complaint or the complaint and exhibits attached to it . . . , the plaintiff has no evidentiary burden.  The task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citation modified).  By contrast, "in a fact-based motion, the defendant [proffers] evidence outside the pleadings to challenge the plaintiff's allegations of standing."  *Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024).  When the evidence so submitted "reveal[s] the existence of factual problems" regarding a plaintiff's standing, *Exch.*

*Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976), the plaintiff "need[s] to come forward with evidence of their own to controvert that presented by the defendant," *Carter*, 822 F.3d at 57. But if "the extrinsic evidence submitted by the parties does not controvert the material allegations of the complaint," a plaintiff need not proffer any evidence in response and the court may find standing based solely on the plaintiff's uncontroverted allegations. *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022). Regardless of the stage of litigation and manner in which standing is raised, "a district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to [its consideration of the issue]." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (internal quotation marks omitted); *see Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court.").

Second, Defendants argue that the Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim. Defts. Motion at 23-35. "To survive [such] a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Although this "does not require detailed factual allegations, . . . [a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks omitted). The complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In reviewing a motion to dismiss for failure to state a claim, a court "accepts as true the factual allegations in the complaint and draws all inferences in the plaintiff's favor." *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015). The court also may consider any "documents attached to the pleading," "documents incorporated by reference in or integral to the pleading," and "matters of which the court may take judicial notice." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th

17

293, 306 (2d Cir. 2021).  Particularly relevant here, a court may take judicial notice of information

that is either "a matter of public record" or "contained on websites where the authenticity of the site

has not been questioned."  *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462-63

(S.D.N.Y. 2020) (internal quotation marks omitted); *see, e.g.*, *Abdin v. CBS Broad. Inc.*, 971 F.3d

57, 60 n.2 (2d Cir. 2020) (taking judicial notice of publicly available scientific publications "for the

publication of such information and relevant discussion in the scientific community"); *Apotex Inc.*

*v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (taking judicial notice of Food and

Drug Administration ("FDA") guidance "because the Guidance is publicly available and its

accuracy cannot reasonably be questioned").

## B.    Analysis

### 1.  Fairly Balanced Claims

#### a.    Standing

Plaintiffs argue that the RLC's unfair balance has caused them to suffer various injuries,

which broadly fall into three categories.[12]  First, Plaintiffs argue that "[g]iven the biases of the

Commission members, . . . it is likely that the Commission's final report will harm [their]

organizational interests."  Zonneveld Decl. ¶ 13; *accord* Raushenbush Decl. ¶ 13; Chakrabarty

Decl. ¶ 9; Gill Decl. ¶ 13; *see* Pls. Opposition at 8-9.  Second, Plaintiffs allege that because the RLC

lacks members who share their perspectives, when the final report is issued they will have to "divert

further resources to advocate for pluralistic democracy and fight back against extremists who would

---

[12] Plaintiffs do not argue that the loss of their right to have the RLC be fairly balanced is, in itself, a sufficient injury under Article III.  That is because the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*— is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Allen*, 468 U.S. at 754 ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.").

privilege those who hold a narrow set of Judeo-Christian beliefs."  Compl. ¶ 97; *see id.* ("Plaintiffs will be forced to expend resources countering a report and recommendations that were produced without informed, representative viewpoints protecting the rights of minority religions from efforts to codify the religious beliefs of majority religions into law.").  Finally, Plaintiffs argue that Reverend Raushenbush was injured because the Commission "fail[ed] to fairly adjudicate his request for membership on the Commission" when his "application" to be appointed was "constructively denied."  *Id.* ¶ 84.

Starting with Plaintiffs' first asserted injury, the Court concludes that the Organizational Plaintiffs can establish standing based on the risk that the RLC's final report will undermine their ability to advocate for policies consistent with their respective missions.[13]  Typically, such an injury would not be sufficiently "actual or imminent" for standing because it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted); *see also Trump v. New York*, 592 U.S. 125, 133 (2020) ("[P]rediction about future injury [is] just that—a prediction."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (explaining that the potential for injury must be based on "more than conjecture").  But a plaintiff that "has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for . . . immediacy."  *Lujan*, 504 U.S. at 573 n.7.  For example, a person "living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, . . . even though the dam will not be completed for many years."  *Id.*  In this sort of case, the standing inquiry turns on "whether the

---

[13] It is well-settled that, as with individuals, "organizations are entitled to sue on their own behalf for injuries they have sustained."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982).

particular procedural violations alleged . . . entail a *degree of risk* sufficient to meet the concreteness requirement." *Spokeo*, 578 U.S. at 342-43 (emphasis added). When there is a "'risk of real harm' to the underlying interest[, that may] establish concrete injury without 'need [to] allege any *additional* harm beyond the one Congress has identified.'" *Strubel v. Comenity Bank*, 842 F.3d 181, 189 (2d Cir. 2016) (quoting *Spokeo*, 578 U.S. at 341-42)).

Applying these principles in the context of FACA, "[m]ost of the courts which have considered the issue have found that a plaintiff . . . who has a direct interest in [a] committee's purpose . . . has sufficient standing to contest whether the committee's composition is fairly balanced under FACA." *Ctr. for Pol'y Analysis on Trade & Health v. Off. of the U.S. Trade Representative* ("*CPATH*"), No. 05 Civ. 5177 (MJJ), 2006 WL 8446407, at *3 (N.D. Cal. June 29, 2006); *see Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074 n.2; *Nat'l Ass'n of Consumer Advocs. v. Uejio*, 521 F. Supp. 3d 130, 144 (D. Mass. 2021); *NAACP Legal Def. & Educ. Fund*, 496 F. Supp. 3d at 128-29; *NRDC*, 410 F. Supp. 3d at 601-02; *Nw. Ecosystem All. v. Off. of the U.S. Trade Representative*, No. 99 Civ. 1165 (BJR), 1999 WL 33526001, at *2 (W.D. Wash. Nov. 9, 1999). This makes sense. FACA's fairly balanced requirement is a procedural right, so a plaintiff need only show a sufficient "degree of risk" of injury. *Spokeo*, 578 U.S. at 342-43. And for plaintiffs that will be "affected by the work of a particular advisory committee," *Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074 n.2, there is a risk that, due to a committee's unfair balance, the committee will be "contrary to [their] position . . . on various issues," *CPATH*, 2006 WL 8446407, at *2. *See NAACP Legal Def. & Educ. Fund*, 496 F. Supp. 3d at 128 (explaining that the plaintiff had "suffered an injury in fact because the government [had] denied [it] a representative voice on the [committee]" and the plaintiff would be "directly impacted by the [committee's] function").

The risk of injury to the Organizational Plaintiffs' interests is also concrete and particularized enough to support standing. To be sure, "an organization may not establish [injury]

20

simply based on [its] . . . strong opposition to the government's conduct." *All. for Hippocratic Med.*, 602 U.S. at 394; *accord Havens Realty Corp.*, 455 U.S. at 379 (explaining that a concrete injury requires "far more than simply a setback to the organization's abstract social interests"). That is true "no matter how longstanding the interest and no matter how qualified the organization." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). So the Organizational Plaintiffs cannot premise standing on the fact that the policies recommended by the RLC may be contrary to their views on, for example, the proper balance between religious liberty and government regulation. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486-87 (1982) ("It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but . . . [t]heir claim that the Government has violated the Establishment Clause does not provide a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court.").

Here, however, the Organizational Plaintiffs' injury is not based solely on the "intensity" of their disagreement with the policies that an imbalanced RLC might propose. *Valley Forge Christian Coll.*, 454 U.S. at 486. Rather, the Organizational Plaintiffs' injury stems from the risk of harm to their core activity of government advocacy on issues relating to the separation of church and state, religious discrimination, and the freedom to worship. *See* Raushenbush Decl. ¶¶ 2-8, 13; Zonneveld Decl. ¶¶ 2-6; Chakrabarty Decl. ¶¶ 2-4; Gill Decl. ¶¶ 2-8, 11-24. To the extent that an allegedly imbalanced RLC is likely to recommend policies on these issues that are contrary to the policies that the Organizational Plaintiffs support, the Organizational Plaintiffs' efforts to advocate for policies will become more difficult. *See Havens Realty Corp.*, 455 U.S. at 379 ("[A] concrete and demonstrable injury to the organization's activities . . . constitutes far more than simply a setback to the organization's abstract social interests."). This case is thus similar to *Havens Realty*, where the Supreme Court held that an organization which "operated a housing counseling service"

21

had standing to sue a realtor for providing black potential tenants with "false information about apartment availability" because doing so "perceptibly impaired [the organization's] ability to provide counseling and referral services."  *All. for Hippocratic Med.*, 602 U.S. at 395 (quoting *Havens Realty Corp.*, 455 U.S. at 379).  Just as the plaintiff in *Havens Realty* was injured because a realtor providing false information interferes with an organization's ability to offer housing counseling, the Organizational Plaintiffs here are injured because an imbalanced RLC proposing slanted policy recommendations interferes with their ability to engage in government advocacy.[14]

The same logic does not apply to Reverend Raushenbush, however.  Whereas government advocacy is part of the Organizational Plaintiffs' "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395, Reverend Raushenbush's special interest in advocating for policies is just that—a special interest.  *See Lujan*, 504 U.S. at 563 (explaining that plaintiffs must be "directly affected apart from their special interest in the subject" to have standing (citation modified)).  And besides "the intensity of [his] interest" in issues of religious liberty, *Valley Forge Christian Coll.*, 454 U.S. at 486, Reverend Raushenbush has not shown how the proposals of an imbalanced RLC might "affect [him] in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1.  *See also Valley Forge Christian Coll.*, 454 U.S. at 483 ("[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the

---

[14] The situation would be different if the RLC were itself enacting policies, as opposed to recommending that Congress or the President enact policies.  For example, in *Alliance for Hippocratic Medicine*, pro-life medical associations did not have standing to challenge the FDA's relaxation of regulatory requirements for mifepristone "based on their mere disagreement with FDA's policies" or "based on their incurring costs to oppose FDA's actions."  602 U.S. at 395.  And for similar reasons, a plaintiff does not have standing to challenge a religious policy such as the conveyance of land to a Christian college, *Valley Forge Christian Coll.*, 454 U.S. at 476-87, unless it "affect[s] the plaintiff in a personal and individual way," *Spokeo*, 578 U.S. at 339 (internal quotation marks omitted).  Here, however, because the RLC only recommends policies, its alleged imbalance gives rise to a particularized injury by interfering with the Organizational Plaintiffs' interest in government advocacy—an interest that is not common to the public at large.

requirements of Art[icle] III without draining those requirements of meaning.").[15]

Reverend Raushenbush also cannot base standing on the theory that he will have to "divert further resources" in light of the RLC's biased policy recommendations. Compl. ¶ 97. First, there is no indication that Reverend Raushenbush *himself*—as opposed to Interfaith Alliance *as an organization*—plans to expend any resources due to the alleged imbalance of the RLC's membership. *See* Raushenbush Decl. ¶ 11 ("*Interfaith Alliance* has had to divert resources." (emphasis added)), ¶ 14 ("[T]he Commission's lack of compliance with FACA . . . has required *us* to expend additional resources." (emphasis added)).[16] Second, even if Reverend Raushenbush were to spend his own money, a plaintiff who "has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing." *All. for Hippocratic Med.*, 602 U.S. at 394. Otherwise, plaintiffs could "manufacture standing by voluntarily taking costly and burdensome measures" that are not necessitated by the challenged conduct. *FEC v. Cruz*, 596 U.S. 289, 297 (2022).

---

[15] In theory, one might argue that Reverend Raushenbush will suffer injury in his capacity as a religious leader due to the RLC's anticipated policy recommendations. But even assuming that the RLC's alleged imbalance might produce policy recommendations that *restrict* religious liberty (as opposed to unduly expand it), the theory that RLC-proposed policies might particularly affect Reverend Raushenbush and his congregants, out of the millions of other religious people in America, "relies on a [too] highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

[16] Although Plaintiffs allege that "*Raushenbush* must increase his efforts to counteract the unfair bias of the Commission through advocacy and expend additional resources monitoring the Commission's work," Compl. ¶ 85 (emphasis added), Reverend Raushenbush's declaration clarifies that any resources would be expended by Interfaith Alliance, not himself personally, *see Touche Ross & Co.*, 544 F.2d at 1131 (relying on evidence extrinsic to the complaint which "revealed the existence of factual problems" regarding the plaintiff's standing). To be sure, Reverend Raushenbush's declaration was submitted by Plaintiffs, not by Defendants "to challenge [Plaintiffs'] allegations of standing." *Lugo*, 114 F.4th at 87. But that does not make the declaration any less reliable for purposes of determining whether Reverend Raushenbush has suffered an injury-in-fact. *Cf. APWU*, 343 F.3d at 627 ("[A] district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to [its consideration of the issue]." (internal quotation marks omitted)).

Finally, Reverend Raushenbush cannot base standing on the allegation that he was deprived of a fair adjudication of his application for membership on the Commission. *See* Compl. ¶ 84. To be clear, Reverend Raushenbush's argument in this regard is not that he was denied *actual membership* due to the RLC's improper balance. After all, regardless of the RLC's ultimate balance, there is nothing before the Court suggesting that Reverend Raushenbush in fact would have been selected as a member of the Commission.

Plaintiffs instead argue that Reverend Raushenbush was denied *fair consideration* for RLC membership, even if he ultimately would have been passed over either way. *See* Pls. Opposition at 5-6. To be sure, the denial of fair consideration can in some cases support standing because it constitutes a kind of stigmatic injury. *See Allen*, 468 U.S. at 755 (discussing "the stigmatizing injury often caused by racial discrimination"). For example, when a school reserves 16 of 100 places in an entering law school class for minority applicants, it injures non-minority applicants by not "permit[ting them] to compete for all 100 places in the class, . . . even if [they are] unable to prove that [they] would have been admitted in the absence of the special program." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978). But in such cases, the alleged statutory or constitutional violation that gives rise to the plaintiff's injury is one which "prevent[s] the plaintiff from competing on an equal footing." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 667 (1993). By contrast, a violation of FACA's fairly balanced requirement does not depend on or imply the use of this sort of "discriminatory classification." *Id.* An agency could consider every application evenhandedly and still assemble a committee that is not fairly balanced, while, conversely, an agency could show favoritism to certain applications and—despite those intentions—still end up selecting a fairly balanced membership. And although treating potential members from certain backgrounds unfairly may be *the reason* a committee ends up unfairly balanced, that treatment is not itself a FACA violation. So even assuming that Reverend

24

Raushenbush was denied fair treatment, Plaintiffs have not shown that such mistreatment was caused "by [the] defendant[s'] statutory violation." *TransUnion*, 594 U.S. at 427; *cf. California v. Texas*, 593 U.S. 659, 669-72 (2021) (finding no standing because the plaintiffs' concrete injury was not traceable to the particular statutory provision being challenged).[17]

Additionally, when standing is based on the denial of fair consideration, the plaintiff must have applied (or shown that he would have applied) to be considered through the proper channels. *See Warth v. Seldin*, 422 U.S. 490, 516 (1975) (holding that the plaintiffs lacked standing because they had not "applied to respondents for a building permit or a variance with respect to any current project"). That is because unequal treatment "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Allen*, 468 U.S. at 755 (internal quotation marks omitted). Here, Reverend Raushenbush claims to have submitted an "application" to join the RLC when, on December 15, 2025, Interfaith Alliance sent a one-page letter addressed to President Trump and former Attorney General Bondi. Raushenbush Decl., Exh. A. But that letter was sent over seven months after the RLC's membership was selected, and the Commission had already held four public meetings on June 16, 2025, September 8, 2025, September 29, 2025, and December 10, 2025. In fact, considering that President Trump announced the RLC's membership on the same day the Commission was created, it is doubtful whether there was an "application process" for the RLC to begin with. *Cf. Texas v. Lesage*, 528 U.S. 18, 21 (1999) ("[T]he government's conclusive demonstration that it would have made the same decision

---

[17] Plaintiffs also have not plausibly alleged that Reverend Raushenbush was denied fair consideration on a discriminatory basis. The RLC's composition is not so stark as to make plausible an allegation of disparate treatment. *See Iqbal*, 556 U.S. at 682 (explaining that "discrimination is not a plausible conclusion" when alternative explanations exist); *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015) ("[T]o show discriminatory intent . . . [a difference in outcomes] must . . . be of a level that makes other plausible non-discriminatory explanations very unlikely.").

absent the alleged discrimination precludes any finding of liability.").

Taking a step back, any injury that Reverend Raushenbush may have suffered here cannot be the type "which [is] traditionally thought to be capable of resolution through the judicial process." *Flast*, 392 U.S. at 97; *see also Allen*, 468 U.S. at 752 ("Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable?"). After all, if Reverend Raushenbush has standing to challenge the composition of the RLC's membership, then presumably any individual with a passion for religious issues could manufacture standing by submitting an application to join the RLC. That would fly in the face of the principle "that a plaintiff raising only a generally available grievance about government—[*i.e.*,] . . . seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74; *see also Allen*, 468 U.S. at 755-56 (rejecting a theory wherein "standing would extend nationwide to all members of the particular . . . groups against which the Government was alleged to be discriminating"); *Sanchez v. Pena*, 17 F. Supp. 2d 1235, 1237-38 (D.N.M. 1998) ("Claims of lost opportunity to represent the public as a [committee] member assert only a generalized grievance against the government that no more directly affects Plaintiffs than other members of the public at large and will not satisfy the Article III case or controversy requirements." (internal quotation marks omitted)).

To support their argument, Plaintiffs point to an out-of-circuit district court decision where an individual was found to have standing after applying and being rejected for membership on an allegedly imbalanced committee. *See Uejio*, 521 F. Supp. 3d at 145.[18] But that decision is not

---

[18] In addition to *Uejio*, Plaintiffs point to two other decisions which they say "support [that an] individual [may have] standing to challenge [a committee's] unfair balance." Pls. Opposition at 5 n.5 (citing *Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074 n.2), 5 (citing *NRDC*, 410 F. Supp. 3d at 602). But neither of these decisions actually held that an individual had standing to challenge the balance of a committee's membership. And to the extent they suggest that an individual plaintiff may, in some instances, have standing, Reverend Raushenbush is not such a plaintiff for

26

binding on this Court and, in any event, its facts are distinguishable.  Most notably, the committee

in *Uejio* "received numerous applications" from candidates before selecting its members, *id.* at 144,

and the applicant had herself "held numerous public service positions at the state and federal level,"

*id.* at 138—including at the agency which created the committee in question—so it was plausible

that she would have been selected as a member had the committee been fairly balanced.

Ultimately, the Court concludes that the Organizational Plaintiffs have standing due to the

risk that the recommendations of an imbalanced RLC would interfere with their government

advocacy efforts.  But Reverend Raushenbush does not share in this injury, nor can he establish

standing based on any need to divert his own resources or on Defendants' failure to consider his

belated and unsolicited application.  His fairly balanced claims are therefore dismissed under Rule

12(b)(1).

### b.    Merits

Although the Organizational Plaintiffs have standing to assert a fairly balanced violation,

they fail to state a claim for two reasons.  First, the RLC's membership has a fair balance of

viewpoints given the functions it performs.  Second, only President Trump is responsible for

selecting RLC members, but the President is not an "agency" suable under the APA and Plaintiffs

have not shown that he violated the sort of "clear nondiscretionary duty" which would entitle them

to mandamus relief.

Because the Court disposes of this case on those grounds, it assumes, for the sake of

argument, that whether an agency's membership is fairly balanced is reviewable under the APA

because it is not "committed to agency discretion."  5 U.S.C. § 701(a)(2).[19]  Although the Second

---

the reasons described herein.  *Cf.* Croley & Funk, *supra*, at 515 n.47 ("As a practical matter, standing may be difficult to satisfy in the context of a [fairly balanced] claim, [even though] the proper plaintiffs making the proper allegations could conceivably satisfy standing requirements.").

[19] Whether a decision is "committed to agency discretion" under the APA, 5 U.S.C.

Circuit has not weighed in, this question has deeply divided the courts to have considered the issue. *Compare Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17-20 (1st Cir. 2020) (holding that the issue is not committed to agency discretion); *Colo. Env't Coal. v. Wenker*, 353 F.3d 1221, 1232-34 (10th Cir. 2004) (same); *Cargill, Inc. v. United States*, 173 F.3d 323, 334-35 (5th Cir. 1999) (same), *and Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods* ("*Microbiological Criteria*"), 886 F.2d 419 (D.C. Cir. 1989) (producing three split opinions discussing the issue), *with Ctr. for Pol'y Analysis on Trade & Health v. Off. of U.S. Trade Representative*, 540 F.3d 940, 944-45 (9th Cir. 2008) (holding that the issue is committed to agency discretion), *Doe v. Shalala*, 862 F. Supp. 1421, 1430 (D. Md. 1994) ("The balance of judicial opinion holds that, by reason of the lack of judicial standards to address alleged 'imbalances' of membership on such committees, Courts will not decide the issue."), *and* Croley & Funk, *supra*, at 519 ("[District] courts have been consistent in denying claims based on alleged lack of balance.").

### i.       Membership Balance

FACA requires that a "[c]ommittee's members represent a fair balance of viewpoints given the functions to be performed," but it does not define what constitutes a "fair balance." *Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074; *see* 5 U.S.C. § 1004(b)(2).[20]   As such, the statute leaves unanswered three sets of questions regarding whether a committee is appropriately balanced. First,

---

§ 701(a)(2), is distinct from the question of whether Congress has more broadly precluded any judicial review of that agency decision, *see, e.g.*, *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486-89 (2015). *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (explaining that Section 701(a)(2) may apply "even where Congress has not . . . precluded [all] review").

[20] The regulations promulgated by the Administrator of the GSA do not clarify the meaning of "fairly balanced" in a way that is useful here.  Under the Administrator's regulations, there are two types of committees: discretionary advisory committees, which are "established under the authority of an agency head or authorized by statute," and non-discretionary advisory committees like the RLC, which are "either required by statute or by Presidential directive."  41 C.F.R. § 102-3.25.  Although the regulations describe considerations which are relevant in determining whether a discretionary advisory committee is fairly balanced, *see id.* § 102-3.60, no comparable provision exists for non-discretionary advisory committees.

"even before the points of view on an advisory committee can be balanced at all," one must ask: "*which* points of view should be balanced[?]"  *Microbiological Criteria*, 886 F.2d at 426 (Silberman, J., concurring).  The next question is: "what constitutes an appropriate or 'fair' balance of those views[?]"  *Id.* (Silberman, J., concurring).  Is a single member representing each view enough, or does a committee need more?  And finally, "which kind of organization or individual legitimately represents" a viewpoint by being a member of a committee?  *Id.* at 429 (Silberman, J., concurring).  For example, what kind of individual would hypothetically speak for an "interfaith perspective"?

Lacking clear answers to these questions, courts have been "highly deferential" in reviewing a committee's composition.  Daniel E. Walters, *The Justiciability of Fair Balance under the Federal Advisory Committee Act: Toward a Deliberative Process Approach*, 110 MICH. L. REV. 677, 677 (2012) (noting that the fairly balanced requirement "is generally considered either nonjusticiable under the Administrative Procedure Act or justiciable but subject to highly deferential review"); *see Wheeler*, 954 F.3d at 19 ("[T]he statute leaves a great deal of discretion to the agency."); *Cargill*, 173 F.3d at 335 n.24 (explaining that the fairly balanced requirement is "subject to highly deferential review"); *Microbiological Criteria*, 886 F.2d at 424 (Friedman, J., concurring) ("The determination of how the 'fairly balanced' membership of an advisory committee . . . is to be achieved, necessarily lies largely within the discretion of the official who appoints the committee."); *id.* at 434 (Edwards, J., concurring) ("[T]he difficulty of determining what precisely constitutes a 'fair balance' may incline courts to be deferential in reviewing the composition of advisory committees."); *NRDC*, 410 F. Supp. 3d at 603 ("[T]he definitions of 'fair' and 'balanced' indicate judicially manageable standards . . . in *extreme* cases." (emphasis added)).

FACA is properly read as requiring such strong deference for two reasons.  First, determining whether a committee is fairly balanced is largely "a political task not properly

undertaken by life-tenured, unelected federal judges," so it is doubtful that Congress wished to leave that question entirely to the courts. *Microbiological Criteria*, at 427-28 (Silberman, J., concurring). Instead, Congress more likely intended for courts to police only the "extreme cases" of imbalance, such as if an agency "were to announce that [it will] exclude all points of view except one." *NRDC*, 410 F. Supp. 3d at 604.

Second, it is notable that "as part of [a] compromise [in FACA's enactment], Congress deleted from the Act any specific standards" governing committee membership. Levine, *supra*, at 228. This compromise stands in contrast to a statute such as the Federal Energy Administration Act of 1974, enacted two years after FACA, which required committees created by the Federal Energy Administrator to include representatives of "residential, commercial, and industrial consumers," "State and local governments," and "State regulatory utility commissions." 15 U.S.C. § 776(a) (repealed 1997). Congress's deliberate choice not to articulate these sorts of specific membership-balance requirements in FACA reinforces that courts should not second-guess the Executive's good faith decisions about a committee's membership. *See* Levine, *supra*, at 228 ("The Act deals with advisory committee membership only in a very limited fashion.").

Under this deferential standard, the RLC's membership is fairly balanced. Its members include workers in the public, private, and nonprofit sectors,[21] have widely varying life experiences—from a former host of a popular television show to a State Lieutenant Governor,[22] are religious leaders as well as rank-and-file congregants,[23] and—to the extent that it matters—

---

[21] Lieutenant Governor Dan Patrick works in the public sector. Compl. ¶ 51. Allyson Ho, a law firm partner, and Eric Metaxas, a radio talk show host, work in the private sector. *Id.* Bishop Robert Barron and Kelly Shackelford run nonprofit organizations. *Id.*

[22] Dr. Phil McGraw was the longtime host of a television show, *Dr. Phil*, while Dan Patrick is the Lieutenant Governor of Texas. Compl. ¶ 51.

[23] Bishop Robert Barron, Cardinal Timothy Dolan, Pastor Franklin Graham, Pastor Paula White, and Rabbi Meir Soloveichik are religious leaders, Compl. ¶ 51, whereas the other RLC members are rank-and-file congregants, *see, e.g., id.* (describing Scott Turner as a "member" of

30

encompass adherents of at least five different religions.[24]

Plaintiffs nonetheless argue that the RLC is imbalanced in three respects.  First, Plaintiffs fault the RLC for "not represent[ing] religious communities aside from Christianity and Judaism," which Plaintiffs attribute to President Trump's "Judeo-Christian framework."  Compl. ¶ 50 (internal quotation marks omitted).[25]  The Court disagrees with this argument for three reasons.  First, the faith of RLC members is not relevant to the Commission's function, which is to "produce a comprehensive report" on issues such as "the foundations of religious liberty in America, the impact of religious liberty on American society, [and] current threats to domestic religious liberty."  90 Fed. Reg. at 19,418; *see Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074 (explaining that FACA requires "a fair balance of viewpoints" only with respect to "the functions to be performed" by the committee).  After all, "faith is a personal matter," *Doe v. Tangipahoa Par. Sch. Bd.*, No. Civ.A. 03-2870 (HGB), 2005 WL 517341, at *4 (E.D. La. Feb. 24, 2005), and the particular deity a person worships, if any, need not affect one's views on public policy issues such as the status of religion in America or the appropriate policies with respect to religion.  It was certainly within President Trump's discretion to decide that it was comparatively more important to prioritize balancing

_____

the Prestonwood Baptist Church).

[24] Although the religious beliefs of each RLC member are not clear, Rabbi Meir Soloveichik is an Orthodox Jew, Pastor Franklin Graham is an Evangelist, Pastor Paula White is a non-denominational Christian, Cardinal Timothy Dolan is a Catholic, and Scott Turner is a Baptist.  *See* Compl. ¶ 51; RLC Website, *Commissioners and Advisory Board Members*, https://perma.cc/2RA8-DMS4 (captured July 22, 2026).

[25] Plaintiffs' accusation that President Trump is using the RLC to further a "Judeo-Christian framework" appears to stem from a single remark that President Trump made to the RLC on September 8, 2025: "As President, I will always defend our Nation's glorious heritage, and we will protect the Judeo-Christian principles of our founding, and we will protect them with vigor."  The American Presidency Project, *Donald J. Trump's Remarks to the White House Religious Liberty Commission* (Sept. 8, 2025), https://perma.cc/Y34B-9WBP (captured July 22, 2026).  It is unclear whether this comment was scripted in advance, what was meant by "Judeo-Christian principles of our founding," or even whether this statement related in any way to the RLC or President Trump's selection of RLC members.

31

whether the RLC's members were "representatives of various *sectors of society*, including the private sector, employers, educational institutions, religious communities, and States."  90 Fed. Reg. at 19,417 (emphasis added). [26]

The Court also rejects the premise that there is a single "Judeo-Christian" viewpoint.  There is a wide diversity of both Christian (Catholic, Baptist, Lutheran, Greek Orthodox, *etc.*) and Jewish (Reform, Conservative, Orthodox, *etc.*) religious denominations, and there are extensive

---

[26] Plaintiffs argue that the "Judeo-Christian" perspective of the RLC members has influenced the RLC's work because (1) RLC meetings have occurred at the Museum of the Bible, Compl. ¶ 70; (2) at the first RLC meeting, "[m]embers of the Commission discussed how Christian faith shaped the nation's understanding of 'freedom, law and human dignity' and quoted a statement that the nation should 'prefer Christians for [our] rulers,'" *id.* ¶ 71 (alteration in Complaint); and (3) the RLC has opened one meeting and closed a second meeting with a Christian prayer, *id.* ¶ 72.  None of these points is persuasive and some are borderline misleading.  First, RLC meetings may have been held at the Museum of the Bible merely because it is a suitable and convenient event space.  Second, the referenced discussion at the RLC meeting actually involved two RLC members—one of whom is no longer on the Commission—describing statements made by John Jay and Thomas Jefferson.  *See* RLC Website, *Statement of Carrie Prejean Boller*, *Religious Liberty Commission Hearing*, at 4 (June 16, 2025), https://perma.cc/J4BK-LYCS (captured July 22, 2026); RLC Website, *Statement of Mark David Hall*, *Religious Liberty Commission Hearing*, at 34 (June 16, 2025), https://perma.cc/J4BK-LYCS (captured July 22, 2026).  Finally, although the prayer at the beginning of the September 8 RLC meeting was led by Cardinal Timothy Dolan, there is no indication that it was a uniquely Christian prayer (or suggestion of what that would mean, given the diverse set of beliefs held by Christians).  *See* The Justice Department, *Second Hearing of the Religious Liberty Commission, Part 1*, at 5:30 (YouTube, Sept. 9, 2025), https://www.youtube.com/watch?v=Dkk9wt9Tjw4 (last visited July 27, 2026).  Similarly, at the end of the September 29 RLC meeting, Pastor Franklin Graham delivered a prayer that at one point referenced "Jesus Christ," but the prayer appears to have been personal, unscripted, and non-denominational.  *See* The Justice Department, *Third Hearing of the Religious Liberty Commission, Part 2*, at 2:00:04 (YouTube, Oct. 1, 2025), https://www.youtube.com/watch?v=H4o2Q6PUKZs (last visited July 27, 2026).

Also misleading is Plaintiffs' assertion that "some members" of the RLC "have actively denounced other religions, such as Islam."  Compl. ¶ 56.  Although the Complaint alleges that Pastor Franklin Graham and Eric Metaxas have each been critical of Islam, *id.* ¶ 58, there is no information that either member has "denounced" it, and the Complaint does not allege that any other RLC member has ever criticized Islam or any other religion.  The Complaint also does not explain what Pastor Graham's and Metaxas's criticism of Islam has to do with the supposed unfairly balanced "Judeo-Christian framework" of the RLC.  Plaintiffs do not allege, for example, that "Judeo-Christians" are any more likely to criticize Islam than Buddhists, Zoroastrians, or members of any other religion.

disagreements between and among these faith traditions on important issues.  Given the wide diversity of Christian and Jewish beliefs, there is no reason to think that an Evangelical member would "balance out" a Catholic member any less than a Buddhist member would.  And if an unavoidable reality of a fourteen-member commission is that some groups will be left out, Plaintiffs do not justify why leaving out non-"Judeo Christian" religions is any more imbalanced than leaving out religions within that group.

Finally, it is not clear where the logic of Plaintiffs' argument ends.  If the RLC is not fairly balanced as to the viewpoints of the Sikh American Legal Defense and Education Fund, even though there are only around 70,000 Sikh-Americans based on the most recent U.S. Census data,[27] does President Trump need to appoint adherents from every single religious denomination in America?  *Cf. Microbiological Criteria*, 886 F.2d at 423 (Friedman, J., concurring) ("Congress [did not] intend[] the fairly balanced requirement to entitle *every* interested party or group affected to representation on the Commission.").  And if the President does include a Sikh member, would it then be unfair to give the relatively small Sikh community the same number of representatives as, for example, the much larger Muslim community?  Taking this to its logical extreme, would Plaintiffs' position suggest that the President must employ a quota system to select members for a committee on an issue of national importance?  Fortunately, these questions need not be asked because the RLC must only be "fairly" balanced—not *perfectly* balanced.  *See NRDC*, 410 F. Supp. 3d at 603 ("[F]airness is a capacious concept.").[28]

---

[27] According to the 2020 U.S. Census, 70,697 Americans report that their ethnicity is at least partially Sikh.  U.S. Census Bureau, *2020 Census Detailed Demographic and Housing Characteristics File A*, tbl. T01001 (2023), https://www.census.gov/data/tables/2023/dec/2020-census-detailed-dhc-a.html (last visited July 27, 2026).

[28] The Court notes that the RLC is not entirely devoid of non-Judeo-Christian input.  Ismail Royer, a Muslim who works as the Director of the Islam and Religious Freedom Action Team for the Religious Freedom Institute, serves on an advisory board to the RLC, *see* RLC Website, *Commissioners and Advisory Board Members*, https://perma.cc/2RA8-DMS4 (captured July 22,

Second, Plaintiffs argue that the RLC is unfairly balanced because "each member of the Commission has expressed the view that the law should protect the exercise of religious beliefs over the civil rights of minority groups." Compl. ¶ 55. The Court disagrees. First, the President was not required to select members who believe that the laws which Plaintiffs call "civil rights protections" should trump constitutionally protected religious exercise. As articulated in the EO, the RLC was created in response to a perceived "emerging threat[]" from "opponents of religious liberty" who seek to "characterize religious liberty as inconsistent with civil rights." 90 Fed. Reg. at 19,417. So just as a committee to combat climate change would not need to include climate-change deniers, a commission to combat "policies [that] have threatened America's unique and beautiful tradition of religious liberty" does not need to include individuals supporting such policies. *Id.* That sort of self-sabotage would not be a fair balance "in terms of . . . the functions to be performed by the advisory committee." 5 U.S.C. § 1004(b)(2).

Moreover, Plaintiffs do not allege facts showing that the RLC members are imbalanced in their perspective on the regulation of religious exercise. Although Plaintiffs state that "each member of the Commission has expressed the view that the law should protect the exercise of religious beliefs over the civil rights of minority groups" and that "several Commission members have . . . argued that religious liberty should include the right to discriminate against members of the LGBTQ community," Compl. ¶ 55, these allegations lack specificity about what each RLC member supposedly said, improperly "lumping [actors] together . . . and providing no factual basis to distinguish their conduct," *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (finding a pleading deficient when it lacked "specification of any particular activities by any particular

---

2026), and in that capacity "advise[s] members of the [RLC]," 90 Fed. Reg. at 19418.

defendant").  Plaintiffs' remaining allegations are that (1) two RLC members are "affiliated" with an organization that has "sought to overturn antidiscrimination and antiharassment laws on religious grounds," Compl. ¶ 57, and (2) seven other members of the RLC oppose either abortion or same-sex marriage on religious grounds, *id.* ¶ 58. [29]  But even accepting that these allegations plausibly suggest that these nine members share a single viewpoint that prioritizes religion over civil rights, that still leaves the RLC's other four voting members, as well as its three *ex officio* members.  A ratio of nine voting members to four voting members (plus three non-voting members) is far from the "extreme case[]" of imbalance that might qualify as unfair.  *NRDC*, 410 F. Supp. 3d at 604; *see also Microbiological Criteria*, at 427 (Silberman, J., concurring) (questioning whether "an even split between opposing viewpoints [is] required" for a committee to be "fairly" balanced).

Plaintiffs' third and final imbalance argument is that the RLC has a skewed "representation of views on . . . the separation of church and state" because "many members [of the RLC] have . . . argu[ed] that religion, specifically what they would term 'Judeo-Christian' values, should be promoted by the government."  Compl. ¶ 56; *see also id.* ¶ 54 ("As currently composed, the Commission's members represent only views . . . in support of maximal protection for the exercise of Judeo-Christian religious beliefs.").  The factual allegations in Plaintiffs' Complaint do not support this bold assertion.  To be sure, Plaintiffs allege that various RLC members have (1) stated that "[t]here is no separation of church and state . . . in our constitution" and that "our nation" is "undergirded" by "Judeo-Christian beliefs," (2) argued that the United States "is a religious nation whose very governmental institutions proclaim the existence of God" and that Church and State should "work together to promote godly principles," (3) advocated for "expressions of religion in

---

[29] Plaintiffs also allege that Carrie Prejean Boller opposes same-sex marriage on religious grounds, Compl. ¶ 58, but as noted above, *see supra* I.A, she stopped serving on from the Commission at least four months ago.

the public space and in civil life" and that faith be "brought back to where it always belongs and that is center," and (4) opposed a "completely secular state." *Id.* ¶ 58.[30]  But these one-line soundbites do not reflect anything close to a single shared worldview.  In fact, these quotations from RLC members do not even concern the same topics—the statements range from opinions concerning constitutional law, to arguments about American history, to beliefs about the importance of religious values.  Someone who believes that there is no separation of Church and State in our Constitution might still disagree, as a policy matter, with someone who believes that there should be expressions of religion in the public space and in civil life.  And even more importantly, the statements that Plaintiffs cite are taken completely out of context, and in most cases, appear to give scant indication of the speaker's current beliefs.  For example, Plaintiffs attempt to characterize Rabbi Meir Soloveichik's present views on the separation of Church and State by quoting a *question* he posed in an article published in the *Torah U-Madda* academic journal two decades ago.  *See id.* (citing Meir Soloveichik, *A Nation Under God: Jews, Christians, and the American Public Square*, 14 THE TORAH U-MADDA J. 62, 63 (2006) ("Should Jews join Scalia in affirming that the United States is a religious nation, whose very governmental institutions proclaim the existence of God?")).[31]

---

[30] These allegations relate to Lieutenant Governor Dan Patrick, Pastor Franklin Graham, Eric Metaxas, Rabbi Meir Soloveichik, Dr. Ryan Anderson, Dr. Ben Carson, Bishop Robert Barron, Pastor Paula White, Cardinal Timothy Dolan, and Dr. Phil McGraw.  Compl. ¶ 58. Plaintiffs do not allege that the RLC's other three voting members or three *ex officio* members have expressed any views regarding the separation of Church and State.

[31] Plaintiffs also mischaracterize past statements from Dr. Ben Carson and Dr. Ryan Anderson.  Plaintiffs allege that Dr. Carson has stated that "church and state should 'work together to promote godly principles.'"  Compl. ¶ 56 (quoting Elana Schor, *Secular groups decry Carson's church and state comment*, Associated Press (Oct. 22, 2019), https://perma.cc/Z74R-Q9LK (captured July 22, 2026)).  But Dr. Carson actually began this 2019 statement by noting that "separation of church and state means that the church does not dominate the state, and it means the state does not dominate the church," and only then added: "It doesn't mean that they cannot work together to promote godly principles." *Secular groups decry Carson's church and state comment*, https://perma.cc/Z74R-Q9LK (captured July 22, 2026).  Similarly, Plaintiffs allege that

Another problem with Plaintiffs' reliance on one-off statements made by RLC members is that there is no indication in the text of FACA that whether a committee is "fairly balanced" turns on the personal opinions of individual committee members. *See Microbiological Criteria*, 886 F.2d at 437 (Edwards, J., concurring) ("Nothing in [FACA] or its legislative history even slightly indicates that Congress intended the presence or absence of balance to turn on an inquiry into the opinions of individual members."). As the Honorable Harry T. Edwards observed in his concurrence in *Microbiological Criteria*, "Congress intended 'balance' to be judged by the members' employment status and background." *Id.* (Edwards, J., concurring). That too makes sense. An inquest into members' personal beliefs is often more obfuscating than it is probative. For example, consider a product safety committee that must be evenly balanced between consumer advocates and industry representatives. If personal opinions were fair game, opponents of the committee could always challenge its work by pointing to isolated "pro-industry" statements made by the committee's consumer advocates or stray "pro-consumer" remarks made by the industry representatives, making it all the more hopelessly difficult for courts to "determine whether the views of a particular committee member are sufficiently close to those of [a particular group] to deem them 'representative.'" *Id.* at 428 (Silberman, J., concurring).

The foregoing discussion illustrates why courts are so "highly deferential" in reviewing whether a committee's membership is fairly balanced, *Cargill*, 173 F.3d at 335 n.24, and thus find a violation of that requirement only in "extreme cases" such as if an agency "were to announce that

---

Dr. Anderson "opposes a 'completely secular state,'" Compl. ¶ 56 (quoting Benedictine College, *Ryan Anderson: What is the Role of Religion in Politics?* (Sep. 18, 2024), https://perma.cc/2D5Y-9EVH (captured July 22, 2026)), but the words "completely secular state" were actually used by Benedictine College to describe Dr. Anderson's assessment of the effects of a 1960 campaign speech by President John F. Kennedy, *see Ryan Anderson: What is the Role of Religion in Politics?*, https://perma.cc/2D5Y-9EVH (captured July 22, 2026). In fact, the same source quotes Dr. Anderson as agreeing with "[t]he institutional separation of church and state." *Id.*

[it will] exclude all points of view except one," *NRDC*, 410 F. Supp. 3d at 604. Here, second-guessing the President's selection of RLC members would require making "quintessentially political" judgments about whether particular RLC members are "representative" of a viewpoint, whether a not-quite-even balance of viewpoints on an issue is "fair," and whether certain viewpoints need to be balanced at all in light of the RLC's functions. *Microbiological Criteria*, 886 F.2d at 426 (Silberman, J., concurring). If Congress had intended for courts to engage in this sort of scrutiny, it surely would have provided clearer standards to employ. But of course, the lack of standards is by design: FACA was enacted due to a compromise wherein "Congress deleted from the Act any specific standards" for committee membership. Levine, *supra*, at 228. Respecting that compromise means accepting the Executive's choices about membership balance in relatively close cases such as this.

### ii.    Responsibility for Membership Selection

Even if Plaintiffs had sufficiently alleged that the RLC is improperly balanced, which they have not, Plaintiffs' fairly balanced claims under the APA would still fail for an independent reason: only President Trump is responsible for selecting the RLC's members. As explained above, *see supra* I.B, the EO provides that the RLC is "composed of up to 14 members *appointed by the President*." 90 Fed. Reg. at 19,417 (emphasis added). This dooms Count One of Plaintiffs' Complaint, which asserts a fairly balanced APA claim against only former Attorney General Bondi and the DOJ, but not President Trump.[32] After all, standing requires a plaintiff to show that the defendant caused his injury and that a favorable decision will redress such injury, *TransUnion*, 594 U.S. at 423, and both of these requirements must be satisfied "for each claim that [a plaintiff]

---

[32] Plaintiffs presumably chose not to name President Trump as a Defendant in Counts One and Three because "the APA applies only to federal agencies," *Atl. States Marine Fisheries Comm'n*, 609 F.3d at 532, and "the President is not an 'agency' under that Act," *Dalton v. Specter*, 511 U.S. 462, 476 (1994).

press[es]," *id.* at 431.  But because only President Trump selected the RLC members, only President Trump could have caused Plaintiffs' injury, and only an order against President Trump could redress such injury.

Plaintiffs argue that this is neither here nor there because the EO states that "any functions of the President under [FACA]" with respect to the RLC "shall be performed by the Attorney General."  90 Fed. Reg. at 19,419.  Plaintiffs reason that the selection of a fairly balanced committee is one of the President's "functions" under FACA, so the Attorney General has authority to select RLC members in order to ensure that the RLC is fairly balanced.  Pls. Opposition at 14.  The flaw with this argument is that "a specific [provision] . . . controls over a general provision . . . , particularly when the two are interrelated and closely positioned."  *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981).  Thus, in the context of the EO, the specific directive that commission members are "appointed by the President" controls the question of who has the authority to select RLC members, notwithstanding the EO's general delegation of the President's FACA responsibilities to the Attorney General.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission.  To eliminate the contradiction, the specific provision is construed as an exception to the general one.").

At oral argument, Plaintiffs nonetheless insisted that "there should have been some kind of cooperative arrangements between the [P]resident and the Attorney General . . . in selecting members."  Oral Arg. Tr. at 29:6-9.  It is not clear what exactly Plaintiffs envision, but any alleged imbalance in the RLC was not "fairly traceable" to the absence of such arrangements.  *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (explaining that "the plaintiff's injury must be fairly traceable to . . . the defendant" (internal quotation marks omitted)).  For one, the RLC's members

39

were announced on the same day that President Trump created the Commission, and Plaintiffs do not allege that former Attorney General Bondi received advance notice of the EO, so there is no indication that she was given an opportunity to cooperate with President Trump in the selection of RLC members.  But even if she had such an opportunity, Plaintiffs do not allege any facts suggesting that the former Attorney General would have been able to persuade President Trump to select different members of the Commission.  Courts are generally "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers" like the President "will exercise their judgment."  *Clapper*, 568 U.S. at 413; *see, e.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) ("[E]njoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements.").

Count Two of Plaintiffs' Complaint avoids these pitfalls by seeking relief under the federal mandamus statute and, in contrast to Count One, naming President Trump (as well as Bush) as a Defendant.  But this Count nonetheless fails because "the extraordinary remedy of mandamus" requires, among other things, "a showing of a clear and indisputable right to the issuance of the writ."  *Miller v. French*, 530 U.S. 327, 339 (2000) (internal quotation marks omitted); *see also Benzman v. Whitman*, 523 F.3d 119, 133 (2d Cir. 2008) (explaining that to receive a writ of mandamus compelling government action, a plaintiff has the burden to show that "the Government has a plainly defined and peremptory duty to perform the act in question").  When a duty "depends upon a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus."  *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 219 (1930).  This is such a case.  Even if one might conclude that the RLC is unfairly balanced, which, as discussed above, this Court does not, that question is not so "free from doubt" as to warrant a writ of mandamus.

40

Thus, even if Plaintiffs had sufficiently alleged that the RLC is unfairly balanced, their fairly balanced claims still fail. On Count One, Plaintiffs fail to establish causation and redressability as to the named Defendants. And on Count Two, Plaintiffs have not shown that the balance of the RLC was so clearly and indisputably unfair as to warrant mandamus relief.

### 2. Disclosure Claims

#### a. Standing

The Court next turns to the disclosure claims in Counts Three and Four, beginning with whether Plaintiffs have standing to assert such claims. Plaintiffs argue that they do because if the RLC were "operat[ing] transparently and in compliance with [FACA's disclosure requirements, they] would be better able to monitor its activities, attend its meetings, participate in those meetings to advance its interests to the extent possible, and educate its stakeholders on the Commission's work." Compl. ¶ 90. In response, Defendants contend that such injury is insufficient to confer standing. *See* Defts. Motion at 16 ("The Complaint . . . alleges only that the Organization Plaintiffs have been forced to pay close attention to an issue and a Commission about which they had already expressed deep interest.").

As with the fairly balanced claims, the Court rejects Defendants' challenge to the Organizational Plaintiffs' standing, but agrees that Reverend Raushenbush has not alleged an injury-in-fact. To be sure, often the "refusal to permit [a plaintiff] to scrutinize [a c]ommittee's activities to the extent FACA allows constitutes a sufficiently distinct injury," similar to how there typically is standing "when an agency denies requests for information under the Freedom of Information Act." *Pub. Citizen*, 491 U.S. at 449; *see also TransUnion*, 594 U.S. at 441 (referring to the concept of "a concrete 'informational injury' under several of [the Supreme] Court's precedents"); *FEC v. Akins*, 524 U.S. 11, 21 (1998) ("[T]his Court has previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be

41

publicly disclosed pursuant to a statute."). But as the Supreme Court recently emphasized, "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442 (internal quotation marks omitted); *accord Harty*, 28 F.4th at 444 ("Even assuming that [a plaintiff] can allege that he was deprived of information to which he is entitled . . . , he must also allege downstream consequences from failing to receive the required information in order to have an Article III injury in fact." (internal quotation marks omitted)). A plaintiff therefore "must show that he has an interest in using the information [that was not disclosed] beyond bringing [a] lawsuit." *Harty*, 28 F.4th at 444 (internal quotation marks omitted); *see, e.g.*, *N.Y. Legal Assistance Grp. v. BIA*, 987 F.3d 207, 217 n.18 (2d Cir. 2021) (explaining, in the context of a FOIA suit, that the plaintiff "raised an individual injury that is concrete and particularized" because "it allege[d] that the agency's failure to make unpublished [documents] publicly available impair[ed its] ability to represent clients in immigration proceedings" (citation modified)); *cf. Murthy v. Missouri*, 603 U.S. 43, 75 (2024) ("While we have recognized a First Amendment right to receive information and ideas, we have identified a cognizable injury only where the listener has a concrete, specific connection to the speaker." (internal quotation marks omitted)).

Here, while the Organizational Plaintiffs allege that they are interested in undisclosed RLC documents because disclosure would allow them to, *inter alia*, "monitor [the RLC's] activities" and "educate [their] stakeholders," Compl. ¶ 90, Reverend Raushenbush has not pointed to any downstream purpose. Indeed, neither the Complaint nor Reverend Raushenbush's declaration explains what interest he has in using the information that the RLC has allegedly failed to disclose. *Cf. id.* ¶ 84 ("Plaintiff Raushenbush is injured by the Commission's *failure to fairly adjudicate his request for membership* on the Commission." (emphasis added)); Raushenbush Decl. ¶ 11 ("As a result of the Commission's lack of transparency, *Interfaith Alliance* has had to . . . monitor the Commission's activities and educate the public about its work." (emphasis added)). Since Reverend

42

Raushenbush therefore lacks an injury caused by the alleged nondisclosures, he does not have standing under Article III to bring a disclosure claim. *See Allen*, 468 U.S. at 754 ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.").

### b.    Mid-Litigation Disclosures

Turning to the merits of the Organizational Plaintiffs' disclosure claims, the Complaint alleges that Defendants violated FACA's disclosure requirements in five ways. First, the RLC "did not provide advance notice of witness lists or other documents made available to the Commission in advance of [its] meetings." Compl. ¶ 76. Second, the RLC did not circulate "agendas for the meetings in advance." *Id.* ¶ 77. Third, "[n]one of the witness statements made to the Commission have been made publicly available in written form." *Id.* ¶ 79. Fourth, "[d]etailed meeting minutes for [RLC] meetings have not been made publicly available." *Id.* ¶ 80. Fifth and finally, the RLC did not produce "complete transcripts for [its] September 8, September 29, or December 10, 2025 meetings" and "at least one" video recording of an RLC meetings "appear[s]" to be edited or incomplete. *Id.* ¶¶ 78, 80.

After Plaintiffs made these allegations, Defendants claimed that the RLC had made publicly available, for the first time, "all (i) notices of RLC meetings; (ii) videos and transcripts of RLC meetings; (iii) minutes of RLC meetings; (iv) written comments submitted by the public prior to RLC hearings and provided to the Commissioners; and (v) materials or packets submitted by the public prior to RLC hearings and provided to the Commissioners." Bush Decl. ¶ 13.[33]

---

[33] For purposes of Defendants' motion to dismiss for failure to state a claim, the Court may not consider Bush's averment that the RLC made available all materials which are required to be disclosed under FACA. *See Lively*, 6 F.4th at 305 (explaining that on a Rule 12(b)(6) motion, a court may consider only the "extrinsic material that the complaint incorporates by reference, that is integral to the complaint, or of which courts can take judicial notice" (citation modified)).

Notwithstanding this representation, Plaintiffs later "identified several documents that were not disclosed," Pls. Opposition at 26, n.12, and after they shared these omissions with Defendants, the RLC published "approximately 60 pages of additional records" which it "had not been previously identified and published due to an oversight," Bush Suppl. Decl. ¶ 4.

Defendants argue that these mid-litigation disclosures moot Plaintiffs' disclosure claims. Defts. Motion at 11-13; Defts. Reply at 3-6. As explained above, *see supra* II.A, mootness is a corollary of Article III's standing doctrine which requires "that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Steffel*, 415 U.S. at 460 n.10. When an "intervening circumstance," such as the disclosure of various documents, "deprives the plaintiff of a personal stake in the outcome of the lawsuit, . . . the action can no longer proceed and must be dismissed." *Genesis Healthcare Corp.*, 569 U.S. at 72 (internal quotation marks omitted).

Plaintiffs contend that their disclosure claims still present a live controversy for two reasons. First, Plaintiffs contend that the disclosures do not change the fact that Defendants violated FACA by denying them "access to the relevant materials *before or at the meeting at which the materials are used and discussed*," *Food Chem. News*, 980 F.2d at 1472 (emphasis added); *see* Pls. Opposition at 25-27, and that such injury can be remedied by enjoining the publication of the RLC's report, *id.* at 27. Second, Plaintiffs dispute the premise that Defendants "completed a full production of all materials required to be disclosed under FACA." *Id.* at 26 n.12; *see also* Oral Arg. Tr. at 11:6-8 (counsel for Plaintiffs arguing that "the defendants have [not] shown they have disclosed all Section 1009(b) materials or that they have done an adequate search for those materials").

As an initial matter, the Court notes that although the parties describe their dispute as an issue of mootness, that is not the most precise characterization.[34] "For the purposes of [a] standing inquiry, a court must assume that the plaintiffs are correct on their legal theory," *B.B. by Rosenthal v. Hochul*, 166 F.4th 259, 278 (2d Cir. 2026), and here, that would mean assuming that FACA's disclosure requirements were violated when the RLC did not make disclosures prior to its first seven meetings. In that case, the Organizational Plaintiffs' claims would not be moot because enjoining the publication of the RLC's report could still provide "effectual relief." *Knox*, 567 U.S. at 307 (internal quotation marks omitted); *see Ellis*, 466 U.S. at 442 ("[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.").

It is therefore more precise to treat Defendants' argument as asserting that Plaintiffs fail to *state a claim for relief* due to fact that the mid-litigation disclosures have satisfied any obligations they may have had under FACA. *See* Defts. Motion at 28-31 (arguing that Plaintiffs' disclosure claim under the APA fails to state a claim). Framed as such, the Court finds Defendants' argument for dismissal persuasive. First, although Plaintiffs allege that Defendants failed to make disclosures, FACA's disclosure provision "contains no deadline by which advisory committee materials must be made available." *LCCRUL*, 265 F. Supp. 3d at 69; *see also Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face.").[35] Accordingly, a committee does not violate FACA by failing to make documents available while its work is still ongoing. *See Byrd v. EPA*, 174 F.3d 239, 244-45 (D.C.

---

[34] To be sure, a few courts have similarly reviewed arguments relating to mid-litigation FACA disclosures under the rubric of mootness. *See, e.g.*, *NRDC*, 2020 WL 5766323, at \*10; *Nat'l Nutritional Foods Ass'n v. Califano*, 457 F. Supp. 275, 281 (S.D.N.Y. 1978).

[35] Although FACA contains no deadline by when committees must disclose their records, it does provide that a committee's records should be made publicly available "until the advisory committee ceases to exist," 5 U.S.C. § 1009(b), which contemplates that committee records will have been disclosed prior to when the committee disbands.

Cir. 1999) ("Because [the plaintiff's] injury resulted . . . from the tardiness of [the materials'] eventual release, his [claim] would [fail] if [the agency] convened another panel."). It follows that because the RLC has not yet held its final meeting, it has not yet violated any disclosure obligation. [36]

Pointing to *dicta* from a single out-of-circuit decision, Plaintiffs nonetheless urge this Court to write into FACA a new rule requiring committees to provide "access to the relevant materials before or at the meeting at which the materials are used and discussed." *Food Chem. News*, 980 F.2d at 1472; *see* Pls. Opposition at 25-26. [37] Plaintiffs insist that this rule would be consistent with FACA's emphasis on "openness and debate," *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1106 (11th Cir. 1994), because advance access to relevant materials allows "interested parties to present their views, and for the public to be informed with respect to the subject matter," *Food Chem. News*, 980 F.2d at 1472. *See* Pls. Opposition at 25-26. But "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). Indeed, FACA was the product of a careful compromise between "proponents and opponents of the advisory committee process," Levine, *supra*, at 225, so it somewhat unsurprising that Congress sought fit to require the disclosure of relevant materials, but at the same time, did not mandate that such disclosure occur at any particular stage during the committee's work. *See id.* at

---

[36] The regulations promulgated by the Administrator of the GSA also do not impose a deadline for FACA disclosures. *See* 41 C.F.R. §§ 102-3.165-102.3.175.

[37] In *Food Chemical News*, the D.C. Circuit wrote that "[i]n order for interested parties to present their views, and for the public to be informed with respect to the subject matter, it is essential that, whenever practicable, parties have access to the relevant materials before or at the meeting at which the materials are used and discussed." 980 F.2d at 1472 (internal quotation marks omitted). But this comment was just a single sentence in an opinion which noted that the appeal had been resolved amicably when, "[a]t oral argument, . . . the two parties essentially conceded to each other's positions." *Id.* at 1471. And in the over thirty years since *Food Chemical News*, no court has held that the Government violated FACA's disclosure requirements by failing to disclose materials prior to the meeting at which such materials would be considered.

230 ("It has been vigorously contended . . . that openness [of advisory committees to public scrutiny and participation] will reduce the effectiveness of advisory committees by inhibiting . . . discussion of controversial or sensitive subjects.").  In any event, consideration of whether it would be more consistent with FACA's aims to require disclosure in the middle of a committee's work is purely academic.  Courts "are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."  *Badaracco v. Comm'r of Internal Revenue*, 464 U.S. 386, 398 (1983).  We "must presume that a legislature says in a statute what it means and means in a statute what it says."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).[38]

Second, even if FACA requires that disclosures occur at a time when they may inform public input, Defendants' mid-litigation disclosures seemingly satisfied that requirement because they were made weeks before a draft of the RLC's report on religious liberty was opened to public comment, allowing ample time for review.  Plaintiffs respond to this point by arguing that it is Defendants' burden to prove that their disclosures cured the deficiencies identified in the Complaint, and that Defendants have not met this burden because they fail to proffer "detailed affidavits that describe all of the materials . . . that have been disclosed."  Oral Arg. Tr. at 10:18-21.  Although Defendants submitted two declarations from Bush, Dkts. 53, 63, Plaintiffs claim that these declarations are "incredibly conclusory," Oral Arg. Tr. at 53:13, because they do not explain in sufficient detail "the scope and method of search [used to find] further . . . materials" that need to be disclosed under FACA, *id.* at 10:20-21.

---

[38] As a practical matter, it is not clear how a committee could possibly disclose all the materials specified under 5 U.S.C. § 1009(b) "before or at the meeting at which the materials are used and discussed." *Food Chem. News*, 980 F.2d at 1472.  For instance, Section 1009(b) requires disclosure of meeting minutes and transcripts, but such minutes and transcripts could only ever be prepared after a meeting has already occurred.

47

Ultimately, Plaintiffs' argument gets the burden backwards—it is, as always, a plaintiff's duty to plead facts which entitle him to relief. *See* Fed. R. Civ. P. 8(a)(2). Here, Plaintiffs initially pleaded that the RLC did not (1) provide "witness lists or other documents made available to the Commission in advance of [its] meetings," (2) circulate "agendas for the meetings," (3) make "witness statements . . . publicly available in written form," (4) disclose "[d]etailed meeting minutes for [RLC] meetings," or (5) produce "complete transcripts for [its] September 8, September 29, or December 10, 2025 meetings" and make available accurate and complete video recordings of its meetings. Compl. ¶¶ 76-80. But after Defendants' mid-litigation disclosures, the Court may take judicial notice that these allegations are no longer true: there are witness lists, witness statements, meeting agendas, transcripts, and video recordings now available on the RLC's website. RLC Website, *Resources*, https://perma.cc/7NL4-W9Y2 (captured July 22, 2026); *see Apotex*, 823 F.3d at 60 (taking judicial notice of FDA Guidance "because the Guidance is publicly available and its accuracy cannot reasonably be questioned"); *Hesse*, 463 F. Supp. 3d at 462-63 (explaining that a court may take judicial notice of information that is "contained on websites where the authenticity of the site has not been questioned"); *Fernandez v. Zoni Language Ctrs., Inc.*, No. 15 Civ. 6066 (PKC), 2016 WL 2903274 (S.D.N.Y. May 18, 2016) (relying on judicially noticeable facts to reject otherwise well-pleaded allegations in a plaintiff's complaint).

It is of course possible that Defendants' disclosures are incomplete or flawed in some way, and for the purposes of a motion to dismiss, the Court may not consider Bush's averments that Defendants have fully complied with FACA. *See Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) ("[A] district court errs when it considers affidavits and exhibits submitted by defendants . . . in ruling on a 12(b)(6) motion to dismiss." (citation modified)). But even though deficiencies in Defendants' mid-litigation disclosures may be the basis for a future FACA claim, Plaintiffs have not made any such allegations here. *Cf. Syracuse Broad. Corp. v. Newhouse*, 236

48

F.2d 522, 525 (2d Cir. 1956) (holding that a district court was "justified" in "brush[ing] aside" a new theory of antitrust liability "made in the briefs and affidavits, but not alleged in the complaint or . . . in any way substantiated").  They have not, for example, sought to amend their Complaint to allege that the meeting minutes disclosed by the RLC do not comply with the requirements of 5 U.S.C. § 1009(c).  And because they do not identify this sort of specific legal violation, Plaintiffs' non-disclosure contentions fail to state a claim.  *See Iqbal*, 556 U.S. 662, 678 ("[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." (citation modified)); *NRDC*, 2020 WL 5766323, at *7 (explaining that a plaintiff's "conjecture is insufficient" after the Government made a mid-litigation disclosure pursuant to FACA).

### III.  Conclusion

For the foregoing reasons, Plaintiffs' Complaint is dismissed in its entirety.  Reverend Raushenbush's claims are dismissed without prejudice for lack of subject matter jurisdiction, *see Carter*, 822 F.3d at 54 ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice."), but the Organizational Plaintiffs' claims are dismissed with prejudice for failure to state a claim, *see Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [for leave to amend] that was not made.").  The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

Dated: July 27, 2026
    New York, New York                                   JOHN P. CRONAN
                                                 United States District Judge